**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Randolph D. Wolfson,              ) | No. CIV 06-2357-PHX-SMM |
|                      )              | |
|        Plaintiff,       ) | **ORDER** |
|                      )              | |
| v.                   )               | |
|                      )              | |
| J. William Brammer, Jr., et al.,  ) | |
|                      )              | |
|        Defendants.    ) | |
|                      )              | |
| _____) | |

      Pending before the Court[1] are Plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order (Dkt. 2) and Defendants' Motion Opposing Accelerated Proceedings (Dkt. 25). Plaintiff filed a Response Memorandum to the Motion Opposing Accelerated Proceedings on October 20, 2006. (Dkt. 28) In turn, Defendants' filed a Reply in Support of Motion Opposing Accelerated Proceedings. (Dkt. 31)

      In light of the Preliminary Injunction Hearing held in this Court on October 31, 2006, and this accompanying Order, Defendants' Motion Opposing Accelerated Proceedings will be denied as moot.

      After considering the parties' briefs, stipulated facts, and the arguments raised by the parties at the Preliminary Injunction Hearing, the Court now issues the following ruling on Plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order:

---

[1] This case was originally assigned to the Honorable Neil V. Wake and was reassigned to this Court on October 20, 2006, after Judge Wake recused himself from the proceedings.

## I. FINDINGS OF FACT

The Court adopts the following Joint Statement of Stipulated Facts submitted by the parties on October 25, 2006 (Dkt. 32):

1.) Plaintiff Randolf D. Wolfson is a 2006 candidate for the Office of Kingman Precinct Justice of the Peace, Mohave County, Arizona.

2.) The Office of Kingman Precinct Justice of the Peace, Justice Court, over which Plaintiff would preside if elected, is a court of limited jurisdiction.

3.) Plaintiff has been an attorney for 24 years and is admitted to the State Bar of Arizona.

4.) On March 20, 2006, Plaintiff filed a $500 Threshold Exemption Statement with the Mohave County Elections Department thus creating his election committee.

5.) On March 20, 2006, Plaintiff issued a press release indicating he had formed an exploratory committee for his election as the Justice of the Peace, Kingman Precinct.

6.) On March 22, 2006, *The Kingman Daily Mi*ner printed an article stating Plaintiff was preparing to run for election for the Justice of the Peace, Kingman Precinct.

7.) On April 28, 2006, the *Tri-State News Network* printed via email an article stating Plaintiff was seeking the Democratic Party nomination for the Justice of the Peace, Kingman Precinct.

8.) On June 9, 2006, Plaintiff filed his Affidavit of Qualification for the Justice of the Peace, Kingman Precinct, 17 sheets of nominating petitions and a financial disclosure statement.

9.) Plaintiff displays pictures on his website [http://www.electwolfsonjp.org] taken at the August 20, 2006 Mohave County Democratic Party Pre-Primary picnic of himself with Governor Napolitano (Democratic candidate for governor of Arizona), Jim Pederson, (former Chairman of the Arizona Democratic Party and Democratic Candidate for United States Senate), Greg Ring (Chairman of the Mohave County Democratic Party), John Thrasher (candidate for U.S. House of Representatives) and Luis Lopez (Democratic candidate for Arizona House of Representatives, District 3).

10.) Plaintiff publicly associated himself with the Mohave County Democratic Party and the Arizona Democratic Party through his attendance at the August 20, 2006 Mohave County Democratic Party Pre-Primary picnic.

11.) In addition to and apart from his campaign for justice of the peace, Plaintiff regularly gives an in person presentation in his capacity as a practicing attorney regarding the issue of same-sex marriage and family values ("Presentation").

12.) The Presentation consists of a PowerPoint presentation in which Plaintiff discusses the political, legal, and moral ramifications of normalizing homosexuality and changing the traditional definition of marriage as between one man and one woman. In the Presentation, Plaintiff discusses current federal and state case law and statutes regarding same-sex marriage, homosexuality, gay adoption, and polygamy, as well as historical attitudes regarding homosexuality and polygamy.

13.) Proposition 107 is a proposed amendment to the Arizona Constitution. The text of the proposed amendment reads: "To preserve and protect marriage in this state, only a union between one man and one woman shall be valid or recognized as marriage by this state or its political subdivisions and no legal status for unmarried persons shall be created or recognized by this state or its political subdivisions that is similar to that of marriage."

14.) As originally written, the Presentation included the following statements relating to Arizona Proposition 107, a ballot initiative in the 2006 election: (1) "ACTIVIST JUDGES CAN BE CONTROLLED BUT IT WILL TAKE A CONSTITUTIONAL AMENDMENT TO GET IT DONE" (2) "Marriage is between a man and a woman. A YES vote on Prop. 107 will prevent a redefinition of marriage by political forces & activist judges."

15.) Before ever giving the Presentation, Plaintiff changed the Presentation by removing the above listed statements and inserting into his discussion of Proposition 107 the following disclaimer: "As a candidate for election to judicial office, Mr. Wolfson is not allowed to state his support or opposition on disputed legal issues."

16.) On September 12, 2006, Plaintiff wrote the Arizona Judicial Ethics Advisory Committee and requested a formal advisory opinion and inquired whether the Code on

1   Judicial Conduct prohibited him from voicing his opinion on Proposition 107 and from
2   discussing his views on disputed legal and political issues.
3         17.) On September 14, 2006, Keith Stott, Executive Director, Commission on Judicial
4   Conduct and Staff Director, Judicial Ethics Advisory Committee, left a phone message for
5   Plaintiff Wolfson, which Mr. Wolfson returned on September 14, 2006. Mr. Stott informed
6   Plaintiff Wolfson that in light of <u>Republican Party of Minnesota v. White</u> that it was Mr.
7   Stott's opinion that Mr. Wolfson could announce his views on political and legal issues,
8   including Proposition 107. Mr. Stott further explained that a formal opinion could take up
9   to sixty days (60) to prepare.
10        18.) Keith Stott again contacted Plaintiff on September 20, 2006, leaving him a
11  telephone message saying that a formal advisory opinion would take at least thirty (30) days.
12        19.) Keith Stott informed Plaintiff's counsel on October 2, 2006, prior to the filing of
13  this lawsuit, that Plaintiff could announce his views on disputed legal and political issues and
14  the formal advisory opinion being written would confirm it.
15        20.) The formal Advisory Opinion requested by Plaintiff was completed on October
16  11, 2006. Plaintiff consented to entering into a joint request to have Rule 82 (b)(1) of the
17  Arizona Rules of the Supreme Court waived and the opinion released.
18        21.) On October 20, 2006 the Arizona Supreme Court issued Order NO. M-06-0025
19  granting the request to suspend Rule 82 (b)(1) to permit release of the formal advisory
20  opinion requested by Plaintiff. Advisory Opinion 06-05, which was released on October 23,
21  2006, states that "A judicial candidate may publicly discuss his or her personal opinion of
22  an
23  initiative measure or other political subject…because a candidate may express views on any
24  disputed issue." The opinion cites to <u>Republican Party of Minnesota v. White</u> in support of
25  its conclusion and also withdraws Opinion 96-11 which prohibited judges from responding
26  to political questionnaires or surveys. The opinion further states that "It is important to note,
27  however, that Canon 5B(1)(d)(i) states: '[A] candidate . . . shall not: . . . with respect to
28  cases, controversies, or issues that are likely to come before the court, make pledges,

1  promises or commitments that are inconsistent with the impartial performance of the
2  adjudicative duties of the office." The commentary to this canon cautions that the candidate
3  'should emphasize in any public statement the candidate's duty to uphold the law regardless
4  of his or her personal views.' Should a candidate choose to make public statements about
5  issues that later come before the court, the candidate may be required to disqualify himself
6  or herself from cases involving those issues."

7  22.) Advisory Opinions can be used as a defense in judicial and lawyer discipline
8  proceedings.

9  23.) Plaintiff has not answered questions during the campaign about his views on
10  various disputed legal and political issues.

11  24.) Plaintiff requests that he be permitted to answer questions during the campaign
12  about his views on various disputed legal and political issues.

13  25.) Plaintiff has not publicly supported Proposition 107, distributed literature in
14  support of Proposition 107 or made phone calls to the public regarding Proposition 107.

15  26.) Plaintiff requests that he be permitted to publicly support Proposition 107 by
16  making phone calls to the public regarding Proposition 107 and by recommending that
17  audiences vote for Proposition 107 and distributing literature in support of Proposition 107.
18  Plaintiff is next scheduled to give the presentation on November 14, 2006.

19  27.) Plaintiff requests that he be permitted to continue to publicly affiliate himself
20  with the Mohave County Democratic Party and the Arizona Democratic Party by attending
21  future meetings, events, appearances at local Party clubs, ordained events and parades,
22  picnics and other similar activities.

23  28.) Plaintiff has not used Democratic Party workers in his campaign nor received
24  active Party participation in his campaign.

25  29.) Plaintiff requests that he be permitted to utilize Democratic Party workers in his
26  campaign and to receive active Party participation in his campaign.

27  30.) Plaintiff requests that he be permitted to make endorsements of other candidates
28  for non-judicial office.

31.) Plaintiff has not personally solicited contributions for his campaign or personally contributed to his campaign.

32.) Plaintiff requests that he be permitted to personally solicit contributions for his campaign at live appearances and speaking engagements, by making phone calls, and by signing his name to fund-raising letters, in any amount without restriction by the Code of Judicial Conduct and to personally contribute to his campaign.

33.) Plaintiff has to this point encouraged members of his family to adhere to the same standards of political conduct in support of his candidacy as the judicial canons require of a judicial candidate.

34.) Plaintiff requests that he not be required to encourage members of his family to adhere to the same standards of political conduct in support of his candidacy as the judicial canons required of him.

35.) Early voting for the November 2006 general election in Arizona began on October 5, 2006.

36.) The general election is November 7, 2006.

In addition to the facts stipulated by the parties, the Court takes judicial notice that Canons 3 and 5 of Rule 81 of the Rules of the Supreme Court of Arizona, Arizona's Code of Judicial Conduct, were last amended on June 8, 2004, after the Supreme Court's decision in Republican Party of Minnesota v. White, 536 U.S. 765, 122 S. Ct. 2528 (2002).

## II. CONCLUSIONS OF LAW

Plaintiff requests injunctive relief in the form of a temporary restraining order or preliminary injunction barring enforcement of the Canons 3E(1), 3E(1)(e), 5A(1)(b)-(d), 5B(1)(a), 5B(1)(d)(i) and 5B(2) of Arizona's Code of Judicial Conduct ("CJC") by Defendants for the remainder of the campaign season. Due to these canons, Plaintiff claims that he is unable to announce his views on disputed legal and political issues; make endorsements; personally solicit funds for his committee; participate in any political

campaign other than his own; support candidates and state ballot initiatives; or, associate himself with a political group or cause and encourage his family members to engage in similar activities before Election Day. (Dkt. 2, at ¶ 4)

**A. Standard of Review**

The purpose of a temporary restraining order or preliminary injunction is to preserve the status quo among the parties pending a final decision on the merits of the action. See Fed. R. Civ. P. 65; Chalk v. U.S. Dist. Court, 840 F.2d 701, 705 (9th Cir. 1988); Regents of the University of California v. A.B.C., Inc., 747 F.2d 511, 515 (9th Cir. 1984). While Rule 65 of the Federal Rules of Civil Procedure establishes the procedural requirements for obtaining a temporary restraining order or preliminary injunction, the substantive requirements for injunctions are defined by applicable federal case law and statutes.

To qualify for a temporary restraining order or preliminary injunction, the moving party must demonstrate either (1) a probability of success on the merits and the possibility of irreparable harm, or (2) that the lawsuit raises serious questions and the balance of hardship tips sharply in the movant's favor. Hoopa Valley Tribe v. Christie, 812 F.2d 1097, 1102 (9th Cir. 1986). These two formulations "are not separate tests but the outer reaches of single continuum." Regents of Univ. of Cal., 747 F.2d at 515. "Essentially, the ...court must balance the equities in the exercise of its discretion." Id.

**B. Analysis**

The moving party is required to demonstrate either a probability of success on the merits or that the lawsuit raises serious questions in order to qualify for preliminary injunctive relief. However, the court begins its inquiry by evaluating the plaintiff's relative hardship because the court cannot know how strong a plaintiff's showing of probable success on the merits needs to be until the possibility of irreparable harm or relative hardship has been determined. "[The] less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." Southwest Voter Registration Ed. Project v. Shelley, 344 F.3d 914, 918 (9th Cir. 2003).

i. Plaintiff's Relative Hardship or Irreparable Harm

Plaintiff claims that injunctive relief is necessary because the CJC effectively chills his speech. According to Plaintiff, he is currently unable to "announce his views on disputed legal and political issues and state ballot initiatives; seek endorsements; personally solicit contributions; support Proposition 107 and other candidates; associate himself with political groups or causes; and, encourage his family members to engage in similar activities." (Dkt. 3 at 14) Plaintiff further contends that his loss of First Amendment rights has resulted in automatic irreparable harm. Id. The Court disagrees.

Plaintiff's actions do not appear to be those of a man currently unable to support other candidates or associate himself with political groups. For example, Plaintiff's own website describes him as an "Independent Proud Democrat" and displays pictures of him with various Democratic Party candidates. In addition, the challenged regulations currently apply to all candidates for the office of Justice of the Peace for Mohave County and Plaintiff has not demonstrated that his particular campaign has been harmed or that his opponent's campaign has gained an unfair advantage due to the regulations in place. Plaintiff has provided nothing beyond conclusory allegations to support his claims of harm.

The Court also finds that Plaintiff has not been threatened with professional discipline and that the Arizona Supreme Court Judicial Ethics Advisory Committee ("JEAC") has been actively working with Plaintiff to address his concerns regarding his desire to announce his views on various political and legal issues. In fact, Plaintiff admits that Keith Stott, Executive Director of the Commission on Judicial Conduct and Staff Director of the JEAC, informed his counsel on October 2, 2006, that he could announce his views on disputed legal and political issues and that the formal advisory opinion being written would confirm it. (Dkt. 32, ¶ 19) Mr. Stott's promise was delivered on October 11, 2006 when the JEAC issued Advisory Opinion 06-05, which addressed Plaintiff's concerns regarding his desire to

support Proposition 107.[2] And, unlike Plaintiff's concerns regarding his desire to announce views on disputed legal and political issues, Plaintiff did not contact the JEAC about any of his other concerns regarding the CJC. There is no evidence to suggest that the JEAC would have been unwilling to once again work with Plaintiff had he simply contacted them.

The Court also finds that Plaintiff's unreasonable delay in bringing this action undermines the severity of the harm he alleges to have suffered. Plaintiff- a lawyer with twenty-four years of legal experience and a candidate for judicial office-- waited until the proverbial eve of the election to assert his claims. Plaintiff set his campaign for Justice of the Peace in motion on March 20, 2006, when he created his election committee; yet, he did not file this case until October 3, 2006. Absentee voting began on October 5, 2006. While Plaintiff is a political novice, he is an experienced attorney and he has not demonstrated that earlier action was impossible, burdensome or a hardship.

Finally, the Court disagrees with Plaintiff's claim that he has suffered automatic irreparable harm as a result of his First Amendment rights being violated. Plaintiff has not offered any controlling law to establish that any of the rights he claims are being violating are protected by the First Amendment. Relying on the Supreme Court's decision in Republican Party of Minnesota v. White, 536 U.S. 765, 122 S. Ct. 2528 (2002), Plaintiff argues that Canons 5B(1)(d)(i) and 3E(1)(e) "have the same essential meaning and effect as the announce clause in White" and therefore are unconstitutional under the First Amendment. However, Plaintiff overlooks a critical distinction between this case and White. In White, the Supreme Court only addressed the constitutionality of Minnesota's announce clause and expressly refrained from offering any views on Minnesota's "pledges or promises" clause. 536 U.S. at 770. Here, Plaintiff challenges Canons 5B(1)(d)(i) and 3E(1)(e) of the CJC (Arizona's "pledges or promises clause"), which are similar to the pledges or promises clause

---

[2] "A judicial candidate may publicly discuss his or her personal opinion of an initiative measure or other political subject under Canon 5A(2), and consistent with Canon 5B(1)(d)(i), because a candidate may express views on any disputed issue." Advisory Op. No. 06-05, Issue 2.

- 9 -

that the Supreme Court expressly declined to consider in White.  Similarly, Plaintiff challenges Canon 5A(1)(c) and Canon 5B(2), Arizona's "Solicitation" clauses, as being unconstitutional on their face as applied to Plaintiff, yet he provides no controlling case law to support these claims. (Dkt. 3 at 34-36).  In short, this case is not as straightforward as Plaintiff suggests and Plaintiff has not demonstrated that he has lost any rights currently recognized under the First Amendment.[3]

### ii. Plaintiff's Constitutional Challenges

Because Plaintiff failed to demonstrate either the possibility of irreparable harm or the balance of hardships tipping sharply in his favor, the Court need not address his probability of success on the merits. "A preliminary injunction may only be granted when the moving party has demonstrated a significant threat of irreparable injury, irrespective of the magnitude of the injury." Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 725 (9th Cir. 1999).  However, the Court will briefly address the merits of Plaintiff's challenge to Arizona's pledges or promises clause to illustrate why his constitutional challenges are premature at this point in the proceedings.  Plaintiff argues that Arizona's pledges or promises clause is unconstitutional on a variety of grounds.  However, Plaintiff's arguments all involve quantum leaps of constitutional development that the Court is unwilling to make without engaging in the traditional methods of discovery.  Without further development of the legal and factual record, the Court would be making important constitutional decisions based on mere supposition.

---

[3] All of the rights that Plaintiff claims are currently being violated derive from extensions of the Supreme Court's reasoning in White. Furthermore, while some of Plaintiff's arguments are supported by cases from other Circuits, all of those cases are factually and legally distinguishable from the present case. For example, Weaver v. Bonner, 309 F. 3d 1312 (11th Cir. 2002) involved a candidate for judicial officer who had been issued a confidential cease and desist order by Georgia's Judicial Qualifications Commission over his conduct during an election for the Georgia Supreme Court. In addition, Family Trust Foundation of Kentucky v. Kentucky Judicial Conduct Comm'n, 388 F.3d 224 (6th Cir. 2004), involved a "promises and commit" clause being used to reach content covered by the "announce clause" in White.

In sum, while Plaintiff makes valid legal arguments about certain provisions of the CJC, the Court finds that these arguments turn on factual underpinnings that have yet to be developed. Additionally, Defendants have advanced compelling arguments to counter those raised by Plaintiff. Therefore, the Court will deny Plaintiff's motion because he has failed to demonstrate either the possibility of irreparable harm or the balance of hardships tipping sharply in his favor. In reaching this decision, the Court notes that it has intentionally declined to address the likelihood of success on the merits for every single provision of the CJC that Plaintiff challenged because it was unnecessary given the Court's finding that Plaintiff failed to demonstrate the possibility of irreparable harm or the balance of hardships tipping sharply in his favor. The Court addressed the merits of Plaintiff's challenge to Arizona's Pledge, Promise, or Commits clause to simply illustrate that Plaintiff's constitutional challenges are best left to the trial stage, where these weighty issues can receive the careful consideration that they deserve. Finally, the Court also notes that it will leave for another day the standing issue raised by Defendants due to the compressed nature of this request for immediate injunctive relief.

### III. CONCLUSION

Accordingly, for the reasons set forth above,

**IT IS ORDERED** that Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction [Doc. No. 2] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion Opposing Accelerated Proceedings (Dkt. 25) is **DENIED** as moot.

DATED this 3rd day of November, 2006.

Stephen M. McNamee
United States District Judge